IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| 14605, Incorporated, | ) | Case No.05-11910 (MFW) |
| (f/k/a Pharmaceutical | ) | |
| Formulations, Inc.) | ) | |
| | ) | |
| Debtor. | ) | |

_____

**MEMORANDUM OPINION**[1]

This matter is before the Court on the Objection of 14605 Inc. f/k/a Pharmaceutical Formulations, Inc. (the "Reorganized Debtor") and ICC Industries, Inc. ("ICC") (collectively, the "Objectors") to the final fee applications filed by the professionals for the Official Unsecured Creditors' Committee (the "Committee"). For the reasons stated below, the Court will overrule the Objection and allow the fees in full.

I.  BACKGROUND

Pharmaceutical Formulations, Inc. (the "Debtor") filed a voluntary petition under chapter 11 of the Bankruptcy Code on July 11, 2005 (the "Petition Date"). As of the Petition Date, the Debtor had secured debt in excess of $44 million, including approximately $20 million owed to The CIT Group/Business Credit,

_____

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure which is made applicable to contested matters by Rule 9014.

Inc. ("CIT") and approximately $24 million owed to the Debtor's parent, ICC. (Ex. 13.)[2] ICC agreed to participate in the debtor-in-possession financing ("DIP Financing") provided to the Debtor by CIT, which was approved on August 3, 2005. (Ex. 17.) On or shortly after the Petition Date, the Debtor also filed motions for approval of bidding procedures, approval of payments to critical vendors, approval of a key employee retention plan, and for approval of the sale of substantially all its assets.

At the time the case was filed, the Debtor had executed an asset purchase agreement (the "APA") with Leiner Health Products LLC ("Leiner") for the sale of substantially all its assets for $23 million plus the assumption of certain trade payables. That bid was insufficient to pay in full the secured debt, including that held by ICC.

The Committee was appointed by the U.S. Trustee on July 20, 2005. The Committee retained Winston & Strawn LLP ("W&S") and Ashby & Geddes ("A&G") as its counsel. The Committee also retained FTI Consulting, Inc. ("FTI") as its financial advisor. No one objected to the Committee's retention of professionals and the Court approved them on August 23, 2005.

---

[2] Citations to "Ex.    " are to the Committee's Exhibits. Citations to "Ex. O-  " are to the Objectors' Exhibits. Citations to "[date] Tr. at [page]" are to the hearing transcripts.

The Committee filed an objection to the DIP Financing
Motion, the bid procedures motion, and many of the other motions
filed by the Debtor.  The objections were resolved with changes
made to many of the proposed orders.  When the Committee was
unable to find additional bidders for the Debtor's assets, the
Court approved the sale to Leiner by Order dated September 22,
2005.  The sale closed shortly thereafter.

With the sale completed, the Debtor, ICC and the Committee
negotiated the terms of a plan of reorganization (the "Plan").
Ultimately, the Plan provided that the Debtor would pay all
administrative and priority claims in full and pay 40% to
unsecured creditors, 20% of which was guaranteed by ICC.  ICC
also agreed to subordinate all its claims (secured and unsecured)
and to pay unsecured creditors an additional 40% if they gave ICC
a release.  (3/16/07 Tr. at 93-98.)  Under the Plan, ICC obtained
the stock in the Debtor's subsidiary, Konsyl Pharmaceuticals,
Inc. ("Konsyl").  The Plan was approved by the creditors and
confirmed by the Court on February 24, 2006.

When the Committee's professionals filed their final fee
applications, ICC and the Reorganized Debtor filed the Objection.
Replies to the Objection were filed by the Committee's
professionals.  After efforts to settle the matter, evidentiary
hearings were held on March 16, May 4, and May 23, 2007.  Post-
hearing briefs were filed by the parties on June 19, 2007, and

3

the matter is now ripe for decision.

II.  <u>JURISDICTION</u>

The Court has subject matter jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 & 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), & (O).

III. <u>DISCUSSION</u>

In the Objection, the Objectors assert that (1) the work done by the Committee's professionals was excessive, unnecessary, and duplicative of each other and of professionals for the Debtor and ICC, (2) the hourly rates charged by W&S and FTI were excessive, (3) fees for the preparation of the professionals' fee applications are not compensable, (4) the Committee professionals overstaffed the case, and (5) several of the professionals were billing for purely administrative or clerical work.  The Objectors accordingly ask the Court to cut the fees of all the Committee professionals by 50%.  While the Objectors concede that the fees requested by A&G are reasonable, they nonetheless ask the Court to reduce them by 50%, with the reduction coming from W&S rather than from A&G.  The Objectors also object to the supplemental fee application filed by W&S because it is for time billed after the Committee was dissolved

4

and solely for defending its final fee application.

A.   <u>Excessive, Unnecessary and Duplicative</u>

The Objectors assert that a large part of the fees requested should be disallowed as excessive, unnecessary, and/or duplicative of work already done by the Debtor and ICC.  They specifically object to the work done by the Committee (1) investigating ICC's claims and liens, (2) negotiating the assumption of unsecured debt by Leiner, and (3) analyzing the remaining unassumed debt.  They contend that those services did not provide any benefit to the estate because (1) at all times ICC stood ready to "assure" a guaranteed recovery of 60% to the unsecured creditors, (2) ICC and the Debtor had already obtained Leiner's agreement to pay all the trade debt in full, and (3) the Debtor had already analyzed the unsecured litigation claims filed in excess of $80 million and determined that they were largely invalid.

1.   <u>Investigation of ICC's Claims</u>

The Objectors assert that ICC "was always ready to assure the unsecured creditors that they would receive at least 60% of the amount owed to them, as indicated on many occasions by ICC's counsel to" the Committee's counsel.  (Objection at p.3.)  At the trial, however, ICC's attorney testified that he never told Committee counsel that ICC would subordinate its claims to the unsecured creditors.  (5/23/07 Tr. at 29-30.)  Although he

testified that he told Committee counsel in a meeting early in the case that the unsecured creditors would be getting a "substantial recovery," the evidence suggests that this meeting was not held until much later in the case, after the Committee had completed discovery. (5/23/07 Tr. at 10-12, 25-26, 57-58.) ICC's counsel further admitted that he consistently pressed ICC's secured and unsecured claims in pleadings and hearings before the Court. (3/16/07 Tr. at 9, 67-68; 5/23/07 Tr. at 30-31; Exs. 4, 5 & 34 at 14-15.) In fact, at trial, ICC's president and counsel both admitted that ICC's strategy during the bankruptcy case was to maintain its secured claims until the appropriate time and then negotiate for a release in exchange for allowing a distribution to the unsecured creditors. (5/4/07 Tr. at 142-43; 5/23/07 Tr. at 29-30.) Obviously, this game plan was never communicated to the Committee. (5/4/07 Tr. at 119-21, 142-43; 5/23/07 Tr. at 29-30.)

In contrast to the Objectors' contentions, counsel who represented the Debtor during the bankruptcy case testified that he was not aware of any statement by ICC early in the case that it was willing to guarantee any recovery for the unsecured creditors. (3/16/07 Tr. at 10.) Counsel for the Debtor also testified that he was unaware of any agreement by ICC to waive its rights as a secured or unsecured creditor. (3/16/07 Tr. at 8-9.)

6

The Committee was similarly unaware of ICC's alleged willingness to guarantee a substantial recovery to unsecured creditors.  Committee counsel testified that in response to an early offer to settle made by the Committee, ICC offered to guarantee only a 10% recovery for unsecured creditors and only if Committee counsel immediately ceased all work.  (3/16/07 Tr. at 54.)[3]

Consequently, the Court rejects as unfounded the assertion of the Objectors that ICC told the Committee that it was always willing to assure a 60% (or even a "substantial") recovery for unsecured creditors.  As a result, the Objectors' contention that there was no benefit realized by the work done by the Committee in investigating the validity of ICC's secured and unsecured claims is equally unconvincing.

As is typical in chapter 11 cases, the Debtor in this case was willing to concede the validity of ICC's claims in order to obtain post-petition financing.  (Ex. 13 at ¶ 9.)  Furthermore, because ICC was the Debtor's parent, counsel for the Debtor testified that he was particularly reluctant to investigate any defense to ICC's claims or affirmative claims against ICC. (3/16/07 Tr. at 17-18.)

---

[3]  ICC's counsel did not deny making that offer, but stated that he did not recall doing so.  He testified that he was sure that, if he had made such an offer, the Committee would have summarily rejected it.  (5/23/07 Tr. at 11, 33.)

As a result, the Court concludes that the Committee properly objected to the DIP Financing Motion in order to protect, inter alia, the right of the Committee on behalf of the estate to investigate and prosecute any actions there may be against ICC.[4] (3/16/07 Tr. at 14, 64-67; Ex. 15.)  In addition to preserving the right to investigate claims by and against ICC, the Committee was successful in getting ICC to remove from the Order approving the DIP Financing (1) any lien or super-priority interest in avoidance actions, (2) any waiver of creditors' rights under section 506(c), and (3) any release of claims against ICC for its pre-petition actions.  (3/16/07 Tr. at 14, 66; Ex. 17 at ¶¶ 4.1 & 5.9.)

While ICC's president testified that the investigation of its claims by the Committee was not instrumental in causing ICC to negotiate and compromise its claims, the Court does not find this to be credible.  (5/4/07 Tr. at 123-24.)  As noted above, ICC did not communicate its willingness to guarantee any recovery for unsecured creditors until after the Committee completed its investigation.  (5/4/07 Tr. at 119-21, 142-43; 5/23/07 Tr. at 29-30.)

It is not surprising that ICC did ultimately agree to guarantee a recovery to unsecured creditors, because the

---

[4]  Counsel for the Debtor agreed that this was an appropriate action by the Committee.  (3/16/07 Tr. at 14.)

Committee's investigation revealed that ICC's financing statement
had expired and been renewed within the preference period.
(3/16/07 Tr. at 68-69.)  Further, that investigation disclosed
that the estate might have claims against ICC for breach of
contract, recharacterization, or equitable subordination based on
a letter sent by ICC to the Debtor's auditors committing to
support the Debtor's cash requirements for operations through
March 31, 2006.  (3/16/07 Tr. at 82-86; 5/4/07 Tr. at 76-80; Ex.
23.)[5]

Counsel for the Debtor testified that the Committee's
investigation was important and assisted the parties in reaching
an agreement on the Plan.  (3/16/07 Tr. at 12, 18-20.)  In fact,
counsel for the Debtor testified that the Committee's plan term
sheet was the framework around which the Plan was built and that
the Committee's professionals were instrumental in drafting the
Plan and accompanying disclosure statement.  (3/16/07 Tr. at 21-
23; Ex. 32.)  Counsel for the Debtor further stated that, in the
absence of an agreement between the Committee and ICC, the Debtor
could have tried to cramdown a plan but it would have involved
litigation and been substantially more costly.  (3/16/07 Tr. at
36-37.)  Ultimately, after the Committee's investigation, the

---

[5] Upon receipt of the support letter, counsel for the
Committee contacted ICC's counsel and offered to stop all work if
ICC would guarantee that all creditors were paid in full.
(3/16/07 Tr. at 84.)  ICC rejected that offer.  (3/16/07 Tr. at
84.)

parties did agree to a consensual Plan. (3/16/07 Tr. at 18-21,
54, 86-95; 5/24/07 Tr. at 24-25; Exs. 24, 25, 26 & 27.)

Therefore, the Court concludes that it was appropriate for
the Committee's professionals, in the fulfillment of the
Committee's fiduciary duty, to investigate the validity of claims
by and against ICC.  Further, the Court finds that the
investigation resulted in a tangible benefit to the unsecured
creditors by facilitating a consensual Plan which provided a
substantial recovery for unsecured creditors guaranteed in large
part by ICC.

2.  <u>Sale to Leiner</u>

The Objectors also complain about the time spent by the
Committee's professionals on the sale of the Debtor's assets to
Leiner.  They note that the APA was negotiated pre-petition and,
despite the Committee's extensive efforts, was not improved post-
petition.

In connection with the sale to Leiner, the Committee
performed two major tasks.  First, it objected to the bid
procedures for the conduct of the auction of the Debtor's assets
in an effort to assure a fair process and undertook other efforts
to attract competing bidders.  (3/16/07 Tr. at 69-72, 75-76, 118-
19;  Ex. 9.)  Second, the Committee negotiated with Leiner to
delineate exactly what executory contracts and trade debt were
being assumed.  (3/16/07 Tr. at 72-74, 117-19; 5/4/07 Tr. at 63-

10

69.)

     With respect to the first task, counsel for the Debtor
testified that he felt it was appropriate for the Committee to
negotiate additional protections under the bid procedures, even
though its efforts did not ultimately result in another bidder
coming forward.  (3/16/07 Tr. at 12, 44-45.)  The Committee
reviewed the bid procedures and sale motion and tried to assure
that they were consistent with obtaining the highest price for
the Debtor's assets.  (3/16/07 Tr. at 69-74;  5/4/07 Tr. at 57-
62; Ex. 9.)  In addition, the Committee's financial advisor, FTI,
identified additional potential bidders from its databases for
the Debtor's investment banker to contact.  (5/4/07 Tr. at 59-
62.)

     The Court concludes that this was an appropriate task for
the Committee and its professionals to perform.  Particularly in
cases where an asset purchase agreement has been negotiated and
signed pre-petition, the Court expects the Committee to be active
in reviewing and, if appropriate, objecting to bid procedures
requested by the stalking horse bidder that may seek to chill
other bids.  Finally, the Court welcomes efforts by the
Committee, whose members may have additional insight into the
industry, to attract additional bidders for the assets.  The
efforts of the Committee and its professionals in this case,
though they ultimately did not result in other bidders, were

11

appropriate in the exercise of their fiduciary duty to the unsecured creditors. See, e.g., Keate v. Miller (In re Kohl), 95 F.3d 713, 714 (8th Cir. 1996) ("While it is not necessary to have a successful reorganization in order for debtor's counsel to be awarded fees, fees may be denied when counsel should have realized that reorganization was not feasible and therefore services in that effort did not benefit the estate."); In re Ames Dep't Stores, Inc., 76 F.3d 66, 72 (2d Cir. 1996) (holding services are compensable if at the time they are performed there was a reasonable likelihood they would benefit the estate) abrogated on other grounds Lamie v. United Stated Trustee, 540 U.S. 526 (2004). In this case, at the time the Committee sought to locate other bidders and to protect them in the sale process, there was a reasonable likelihood that the Committee would succeed. If it did, there would be a tangible benefit to the estate: a higher bid for the Debtor's assets. Therefore, the Court concludes that the efforts of the Committee's professionals in this regard are compensable.

In addition to concerns about the timing of the sale and the amount of overbid protections given to Leiner, however, the Committee was most concerned with determining how much trade debt Leiner was assuming, both to get as many unsecured creditors paid as possible and to have a definitive price against which others could bid. (3/16/07 Tr. at 71-72; 5/4/07 Tr. at 23-27, 63-69.)

12

The Committee's financial advisor, FTI, spoke with the Debtor's financial advisors who had only a general idea of what was to be assumed. (5/4/07 Tr. at 64-65.)  Consequently, FTI spoke with Leiner's financial advisor and together they constructed a list of the specific trade payables to be assumed.  (5/4/07 Tr. at 63-69.)  As a result of its efforts, the Committee obtained a commitment from Leiner to pay in excess of $5 million in unsecured trade debt.  (5/4/07 Tr. at 29-30, 63-69.)

The Debtor's counsel testified that he felt it was appropriate for the Committee to negotiate with Leiner with respect to the claims it was willing to assume.  (3/16/07 Tr. at 12-13, 41-44.)  In fact, representatives of the Debtor participated in the calls between Leiner and the Committee on that issue.  (5/4/07 Tr. at 113.)  Although the APA had language regarding the assumption of trade payables, counsel for the Debtor acknowledged that, because the schedule of assumed debt was blank, the agreement was ambiguous.  (3/16/07 Tr. at 15-16, 42.)[6]  Therefore, he believed that it was essential that a list of assumed debt be prepared.  (3/16/07 Tr. at 15-16, 42.)

ICC's president disagreed.  He testified that the interference by the Committee actually resulted in negotiations with Leiner being reopened and that it was only through his

---

[6]  Although ICC's president felt that the APA was not ambiguous, he acknowledged that he could not be sure that Leiner agreed with his interpretation of it.  (5/4/07 Tr. at 147-48.)

efforts that Leiner ultimately agreed to pay the trade debt. (5/4/07 Tr. at 112-16, 134-36.)  ICC's president acknowledged the need to know the amount of debt being assumed in order to know the price of the assets, but felt that the APA's general language was adequate for that purpose.  (5/4/07 Tr. at 149.)  Under that language, the resolution of what trade claims would be assumed was to be determined after closing as part of the working capital adjustment process.  Therefore, he stated that to the extent trade debt was not assumed by Leiner, the working capital would simply have been adjusted, possibly requiring that Leiner pay more for the assets.  (5/4/07 Tr. at 111, 114-15.)

Even if the Objectors are correct, however, the failure of Leiner to assume trade debt (though it did not matter that much to Leiner) was significant to the unsecured creditors.  If a trade debt was assumed, that creditor would be paid in full by Leiner; if a trade debt was not assumed, Leiner might pay more to the estate but the creditor was likely to receive only a portion of its claim from the estate.  Therefore, the Court concludes that it was in the best interest of the unsecured creditors for the Committee's professionals to seek a definitive commitment by Leiner to pay as many trade claims as possible.

3.  <u>Claims Analysis</u>

The Objectors also contest the work done by the Committee on analysis of the claims of the unsecured creditors whose debt was

14

not assumed by Leiner.  The Objectors assert that this was unnecessary and duplicative of work done by ICC and the Debtor. ICC's president testified that he had already analyzed all the claims and determined that only about $1.75 million were valid. (5/4/07 Tr. at 123-26.)[7]

Nonetheless, the Committee felt it was necessary to review the unassumed claims because of the terms of the plan being negotiated with ICC.  (3/16/07 Tr. at 121-23, 5/4/07 Tr. at 81-86.)  In response to the Committee's request for a guarantee of a percentage distribution to unsecured creditors, ICC agreed only to contribute a specific dollar amount.  (3/16/07 Tr. at 23-25, 90; 5/4/07 Tr. at 81-86; 5/23/07 Tr. at 39-40.)  As a result, the Committee felt it had to analyze the remaining unsecured claims to determine if the proposed contribution by ICC would result in a meaningful recovery for unsecured creditors.  (3/16/07 Tr. at 23-25; 5/4/07 Tr. at 11-15, 81-86.)

Counsel for the Debtor conceded that, although his firm ultimately did the claims reconciliation in the case, that was done after the deal reached by the parties on the Plan.  (3/16/07 Tr. at 23, 47-48.)  He agreed that it was necessary for the

---

[7]   ICC also asserts that the professional at FTI who was performing that task was inexperienced and the work done by him was excessive and unhelpful.  (5/4/07 Tr. at 150-52.)  However, ICC never told the Committee this, which would have allowed them to replace that professional if that were the case.  (5/4/07 Tr. at 68, 90-91, 93, 152; 5/23/07 Tr. at 43-44.)

Committee to analyze the claims at the time of the plan
negotiations to assure that the proposed plan provided a
meaningful recovery for unsecured creditors.  (3/16/07 Tr. at 23-
25, 40, 48.)

The Court agrees with the Committee's professionals that
they had a fiduciary duty to review the unsecured claims in order
to assure that the valid claims received a meaningful recovery.
Although the Objectors argue that all parties (the Debtor, ICC
and the Committee) were on the same side and the Committee should
have relied on ICC's claim analysis, the Court disagrees.
Because ICC refused to guarantee a specific percentage recovery
for unsecured creditors, the Committee could not have relied on
ICC's assertions that the contribution by it would result in a
meaningful recovery.  Filed proofs of claim are prima facie
valid.  Fed. R. Bankr. P. 3001(f).  Therefore, it would have been
unreasonable for the Committee to rely solely on ICC's word that
the $82 million in filed litigation claims were really less than
$2 million in valid claims.  (3/16/07 Tr. at 80-81; Ex. 8.)

Consequently, the Court concludes that the Objectors'
contention that the efforts of the Committee's professionals were
excessive, unnecessary, and duplicative should be overruled.

B.    <u>Excessive Rates</u>

The Objectors also contend that the billing rates of W&S and
FTI are excessive and should be reduced.  They assert principally

that all the work done on the case could have been done by local
counsel, A&G,[8] and that therefore W&S's rates should be no more
than those charged by A&G. (5/4/07 Tr. at 41.)   See, e.g., In re
Casull, 139 B.R. 525, 528 (Bankr. D. Colo. 1992) (reducing hourly
rates in a consumer bankruptcy case to rates customarily charged
in such cases because case was not complex); In re Waldoff's,
Inc., 132 B.R. 329, 335-36 (Bankr. S.D. Miss. 1991) (concluding
that case involving a local Mississippi clothing retail merchant
was not a complex chapter 11 case involving novel issues which
required national counsel and therefore allowing only local
rates).

W&S contends that it should not have been required to
delegate all the work to A&G but that it was appropriate for the
Committee to divide the work between the two firms.  (3/16/07 Tr.
at 57.)

The Court agrees with the Committee's professionals.  The
cases cited by the Objectors are distinguishable because they
involved cases that were not complex.  Further, those cases are
not binding on this Court but Third Circuit authority on this
point is.  It is true that the Third Circuit has stated that "[a]
run-of-the-mill bankruptcy case does not warrant the lofty fees

---

[8]  ICC's in-house counsel testified, in contrast, that A&G
did too much work in this case and should have been limited to
the tasks that local counsel normally perform.  (5/4/07 Tr. at
190.)

17

of nationally-renowned law firms." In re Busy Beaver Bldg.
Ctrs., Inc., 19 F.3d 833, 856 n.35 (3d Cir. 1994).  However, the
Third Circuit has also held that the starting point of the
analysis of professional fees is the market rates charged by the
firm and bankruptcy courts may not reduce those rates simply
because they are higher than local rates.  Zolfo, Cooper & Co. v.
Sunbeam-Oster Co., 50 F.3d 253, 256, 260 (3d Cir. 1995)
(concluding that bankruptcy court should have started with
applicant's higher New York rates and then reduced them because
the services rendered were duplicative of other professionals and
performed by senior personnel rather than more junior persons
with lower rates).  See also In re Temple Ret. Cmty., Inc., 97
B.R. 333, 342 (Bankr. W.D. Tex. 1989) (noting that "[m]any
bankruptcy cases are often more regional or even national than
they are local in scope, so that looking solely to the local
community's range of rates would impose an unnecessarily
parochial cap on the case") (citations omitted).

A similar approach is necessary in this case.  The Court
first considers whether the rates charged by the Committee
professionals are market rates.

The Objectors contend that the hourly rates charged by the
Committee's professionals are excessive, but offer no evidence to
support that position.  Instead, the Objectors assert that the
burden is on FTI (and W&S) to prove that their rates are market

18

rates and, therefore, justified.

The Committee's professionals testified that their rates are the standard rates charged by them to all their clients. (3/16/07 Tr. at 111-12; 5/4/07 Tr. at 92.)  Counsel for the Committee further testified that his firm's rates (because the firm is in Chicago) were actually less than the rates charged by New York counsel for ICC, Leiner, and CIT.  (3/16/07 Tr. at 46-47, 111; 5/4/07 Tr. at 42.)  Finally, the Committee's professionals note that they provided the parties with budgets of their expected fees early in the case, to which there were no objections, and that their actual fees were always less than the budgeted amounts.  (3/16/07 Tr. at 104-06; 5/4/07 Tr. at 89-90.)

While the Court acknowledges that the burden of proving that its fees are reasonable is always on the applicant,[9] the Court does not believe that it is incumbent on the applicant in every case to submit a market survey of rates to justify its normal rates.  If the rates charged are the firm's normal rates which it charges to non-bankruptcy clients, the Court can assume that they are market rates or the firm would not be in business long.  Busy Beaver, 19 F.3d at 849.  Further, the Court is generally familiar with the market rates for counsel in sophisticated chapter 11 cases and, therefore, will only require such evidence if the

---

[9] See, e.g., Zolfo, Cooper & Co. v. Sunbeam-Oster Co., 50 F.3d 253, 260 (3d Cir. 1995); In re Spanjer Bros., Inc., 203 B.R. 85, 89-90 (Bankr. N.D. Ill. 1996).

Court believes the rates requested deviate significantly from
rates the Court observes in other similar cases.  Id. at 854
(observing that "certainly a bankruptcy judge's experience with
fee petitions and his or her expert judgment pertaining to
appropriate billing practices, founded on an understanding of the
legal profession, will be the starting point for any analysis")
(emphasis in original).  If an objector contends that the rates
are not market rates, the Court would expect the objector to come
forward with some evidence of that in the first instance.

Consequently, the Court concludes that the rates charged by
the Committee's professionals are market rates.  Accordingly,
there is a presumption that they are appropriate.  Zolfo, Cooper
& Co., 50 F.3d at 260.

The Court then considers the complexity of the case.
Contrary to the Objectors' assertions, this was not a simple or
pre-packaged case.  There were numerous complicated matters early
in the case: DIP Financing provided in part by an insider, a sale
of the business as a going concern, investigation of the validity
of the insider's secured claims, a key employee retention plan,
and numerous other matters.  As a result, the Court concludes
that it was appropriate for the Committee to retain out-of-state
counsel.  See In re Washington Mfg. Co., 101 B.R. 944, 952
(Bankr. M.D. Tenn. 1989) (holding that "[t]he specialization of
[counsel] in bankruptcy reorganizations of this type, the

20

participation in that decision by the debtors' local counsel, the urgencies of the debtors' financial condition, the regional nature of the debtors' holdings and creditors, the fact that the primary creditor was a national lender, the locale of some large unsecured creditors in New York, and the involvement of nonlocal counsel for several creditors all support the reasonableness of the debtors' selection of" New York counsel and the reasonableness of counsel's New York rates).

Even if the Court were to conclude that this case was not a national case but mandated use of local rates, the rates charged by the Committee's professionals are comparable to those charged by the Debtor and the other parties in this case.  ICC, Leiner, and CIT all had New York counsel who were charging higher rates than the Committee's professionals.  (3/16/07 Tr. at 46-47, 111; 5/4/07 Tr. at 42.)  Further, the rates charged by W&S are not significantly more (when years at the bar are considered) than the rates charged by the Debtor's counsel, which is a Delaware firm.  (Exs. 41 & 48.)

In this case, the Court finds that the fees sought by the Committee's professionals are based on the normal rates charged by them and are comparable to the rates charged by counsel utilized by other parties in this case.  Consequently, the Court finds no basis to conclude that the hourly rates charged by the Committee's professionals are excessive.

C.    Fee Preparation Time

The Objectors also argue that, as a matter of law, counsel is not entitled to recover any fees for preparation or defense of its fee applications.  See, e.g., In re Rothman, 206 B.R. 99, 111-12 (Bankr. E.D. Pa. 1997) (holding that counsel's efforts in "pursuit of its own fee application are of no benefit to either the estate or the Debtor individually" and therefore "is generally not compensable from the debtor's estate") (citations omitted).  Accord In re Courson, 138 B.R. 928, 932-33 (Bankr. N.D. Iowa 1992) (refusing to allow fees for preparation of fee application on basis that it is part of the attorney's cost of doing business); In re Alan I.W. Frank Corp., 71 B.R. 585, 586 (Bankr. E.D. Pa. 1987) (following Third Circuit "fund in court" cases where fees are not allowed for preparation of fee request); In re WHET, Inc., 61 B.R. 709, 712 (Bankr. D. Mass. 1986) (allowing only half of requested compensation for extra work entailed in preparing detailed fee application).

In addition, the Objectors offered the testimony of Paul Falick, ICC's in-house counsel, who testified that a commercial client would never pay for work done by its outside counsel in preparing its own bills.  The Objectors assert, therefore, that they have established that there is no justification for paying such fees.

The Committee's professionals disagree and cite the express language of the statute and cases that do allow fees for preparation and defending fee applications in bankruptcy cases. See, e.g., 11 U.S.C. § 330(a)(6) ("Any compensation awarded for the preparation of a fee application shall be based on the level and skill reasonably required to prepare the application."); In re Smith, 317 F.3d 918, 928 (9th Cir. 2002) (holding that § 330(a) expressly contemplates compensation for preparation of fee applications and that preparation of fee applications benefits the estate by allowing trustee to determine the amount of administrative expenses); In re Nucorp Energy, Inc., 764 F.2d 655, 659 (9th Cir. 1985) (holding that "[t]o require counsel to devote considerable time to the preparation of fee applications, but to demand that they absorb the substantial cost associated therewith, would be to ignore the direct mandate of section 330(a) that reasonable compensation be provided for all 'actual, necessary' services rendered by bankruptcy counsel"); Rose Pass Mines, Inc. v. Howard, 615 F.2d 1088, 1093 (5th Cir. 1980) ("We have long required an attorney to file a detailed account of the legal services he provided the bankrupt in order to recover any compensation at all for his services.  It would be unduly penurious to require such an accounting without granting reasonable compensation" therefor.) (citations omitted); In re On Tour, LLC., 276 B.R. 407, 420 (Bankr. D. Md. 2002) (holding that

23

professionals are entitled to be compensated for preparation of fee applications).

Clearly the statute contemplates that fees will be allowed for preparation of fee applications in bankruptcy cases. 11 U.S.C. § 330(a)(6) ("Any compensation awarded for the preparation of a fee application shall be based on the level and skill reasonably required to prepare the application."). Further, although the Court previously has held that costs incurred in defending a fee application are not compensable, that decision was reversed. In re Worldwide Direct, Inc., 334 B.R. 108, 109 (D. Del. 2005). In that case, the District Court stated that the Third Circuit had held that

> the unambiguous policy inspiring Section 330(a), '. . . is that professionals and para-professionals in bankruptcy cases should earn the same income as their non-bankruptcy counterparts.' In re Busy Beaver Building Centers, Inc., 19 F.3d 833, 849 (3d Cir. 1994). That policy cannot be vindicated through the rule expressed by the Bankruptcy Court in this case. If compensation is not permitted for fees incurred in defending a fee application, 'creditors could negotiate reductions in these fee awards knowing full well that the attorney is in a no-win situation. Even if the attorney prevails, he or she will in effect have financed the litigation without any hope of surviving it whole.' Big Rivers Electric Corp. v. Schilling (In re Big Rivers Electric Corp.), 252 B.R. 670, 675 (W.D. Ky. 2000).

334 B.R. at 111.

Consequently, the Court must conclude that the fees sought by the Committee's professionals for defending the Objection to their fee requests are compensable.

D.   <u>Overstaffing</u>

The Objectors also contend that the case was overstaffed by the Committee's professionals as is evidenced by the number of professionals working on the case and by the number of conferences that the Committee's professionals required among themselves to coordinate their work.  (Exs. O-4, O-5 & O-9.)  The Objectors also note that lead counsel for the Committee consistently copied everyone on his numerous e-mails in the case, thereby driving up fees by requiring that the recipients read those e-mails (and bill the estate for doing so).  (5/4/07 Tr. at 33; Ex. O-1.)

The Committee's professionals dispute the Objectors' contention that there were too many professionals involved.  They note that the Debtor and ICC had comparable numbers of professionals working on the case, which was necessitated because of the complexity of the issues and the fast-pace of the case (confirmation occurring less than eight months after the Petition Date).  They also argue that their fees are reasonable on a macro basis when compared with the fees charged by the Debtor's and ICC's professionals.

The Court agrees.  On a pure numbers basis, the Court is not convinced that the Committee utilized too many professionals. For example, the Debtor had 21 attorneys and 6 paralegals working on the case.  (3/16/07 Tr. at 28; Ex. 68.)  The Debtor's

financial advisors used 7 professionals.  (3/16/07 Tr. at 28; Ex. 68.)  ICC used 11 attorneys and 11 financial advisors.  (3/16/07 Tr. at 29; Ex. 68.)  The Committee utilized 12 attorneys, 5 paralegals, and 8 financial advisors.  (Ex. 68.)  Given the complexity of the case, the Court concludes that the staffing level used by the Committee's professionals does not constitute overstaffing the case.  Furthermore, the Court finds that the gross fees sought by the Committee's professionals (approximately $1.1 million) are reasonable when compared to the total fees charged by the Debtor's and ICC's professionals (approximately $2.4 million).  (Exs. 41, 44 & 45.)

Because there were so many Committee professionals in the case, however, the Objectors argue that there were excessive intra-office conferences.  The Objectors presented a chart which they assert demonstrates that the Committee's professionals engaged in excessive intra-office teleconferences and meetings, which they contend totaled approximately $154,000 of the fees requested.  (Ex. O-9.)

On cross-examination, however, ICC's in-house counsel had to admit that many of the meetings on that exhibit were with the Committee itself and should not have been included because having a meeting with one's client is not objectionable.  (5/4/07 Tr. at 183-85.)  He further admitted that many of the conferences were with ICC or the Debtor and, therefore, were not meetings among

the Committee's professionals alone.  (5/4/07 Tr. at 187-89.)
Therefore, the Court finds the chart of little value.

In evaluating whether a professional overstaffed a case, the
Court considers whether more than one attorney from the firm
attended a meeting or court hearing.  In re Kennedy Mfg., 331
B.R. 744, 750 (Bankr. N.D. Ohio 2005) ("In the absence of an
adequate explanation, it is the general rule that 'overstaffing'
will be presumed to exist, thereby requiring a reduction in fees,
when more than one attorney charges the estate for intraoffice
conferences, meetings and court appearances.").  In a complex
case, however, one attorney cannot perform all the tasks
required.  Where more than one attorney is involved, a certain
amount of intra-office conferencing is necessary in order to
coordinate their tasks.  See, e.g., In re Jefsaba, Inc., 172 B.R.
786, 800 (Bankr. E.D. Pa. 1994) ("Further, in light of our strong
support for the use of paralegals and associates, we recognize
the need for intraoffice conferences so that matters can be
discussed and assignments made and reviewed.  All participants
may bill for the time spent in the intraoffice conferences with
the caveat that the normal requirements of specificity . . . and
reasonableness apply.  However, when more than one professional
is working on the same matter, communication and coordination is
required.  One person must be aware of what everyone is doing or
unnecessary duplication of work will result.") (emphasis in

27

original).

In this case, counsel for the Committee testified that because of the press of work and the ability of A&G, tasks were split between W&S and A&G.  (3/16/07 Tr. at 57, 99.)  The Committee was consulted about the tasks on an on-going basis. (3/16/07 Tr. at 59-60.)  Further, the Committee's professionals made concerted efforts to avoid duplication of effort.  (3/16/07 Tr. at 104.)

Based on the evidence presented and the Court's review of the fee applications of the Committee professionals, the Court concludes that the staffing level was appropriate and that the professionals did not duplicate efforts in this case.  Further, the Court concludes that the practice of Committee's counsel in copying the other Committee's professionals on e-mails was an appropriate means of ensuring coordination of their efforts.  It eliminated the need to have additional conferences to bring other professionals up to date on the status of the case or to coordinate their activities.

   E.   <u>Administrative and Clerical Work</u>

The Objectors also complain that W&S billed paralegals at $220 per hour who were doing largely administrative and clerical work.  They specifically point to the work of one paralegal who billed over $20,000 for reviewing and distributing pleadings to the responsible attorneys.  Similarly, the Objectors complain

28

that FTI billed $95 per hour for a person who made photocopies.

The Third Circuit has held, however, that administrative or clerical work performed by professionals may be compensable. See, e.g., Busy Beaver, 19 F.3d at 851.  In Busy Beaver, the Bankruptcy Court had disallowed compensation for services performed by paralegals which were purely clerical or administrative.  In reversing, the Third Circuit stated:

> At times temporal constraints may foreclose the delegation option.  At other times a paralegal - or, for that matter, an attorney - can more productively complete a clerical task, such as photocopying documents, than can a legal secretary.
> For example, the combination of the paralegal's effort in retaining and instructing a legal secretary with the legal secretary's effort in performing the task may exceed the paralegal's effort in performing the task alone.  Or, a legal secretary may lack the judgment needed in selecting and collating the documents to copy, and the expense of having a paralegal or attorney first instruct the legal secretary and then review his or her work for thoroughness and accuracy combined with the legal secretary's time (albeit subsumed within overhead) may exceed the expense of having the paralegal or attorney personally perform the task in the first place.  Or, a legal secretary may simply be unavailable in time to meet a pressing deadline.

19 F.3d at 852-53.  See also, Jefsaba, 172 B.R. at 809-09 (allowing fees for attorney spent in administrative tasks which "if delegated to a lower cost person, would have been more costly than [attorney] performing the tasks quickly as he did").

Therefore, the Court concludes that the fees requested by the Committee's professionals should not be reduced simply because of the clerical or administrative nature of the tasks

performed.

IV.   <u>CONCLUSION</u>

For the reasons stated above, the Court overrules the
Objection of ICC and the Reorganized Debtor to the final fee
applications of the Committee's professionals and will allow
those fees in full.

An appropriate Order is attached.


Dated: September 19, 2007     BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge